# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* MATHUR BADR,<br><br>        *Plaintiffs,*<br><br>v.<br><br>CVS HEALTH CORPORATION; CVS RX SERVICES, INC.; and OMNICARE, INC.<br><br>        *Defendants.* | Civil Action No.<br>_____<br><br>**FILED UNDER SEAL**<br>Pursuant to 31 U.S.C. § 3730(b)<br><br>**FALSE CLAIMS ACT COMPLAINT**<br><br>**DO NOT ENTER ON PACER**<br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Mathur ("Matt") Badr ("Relator") brings this action on behalf of the United States of America pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3730(b), and shows the Court as follows:

### I.        Introduction

1.        This action seeks to recover damages and civil penalties on behalf of the United States of America based upon false claims for payment for prescription medications and compounded drugs submitted to the Medicare and Medicaid Programs that resulted from at least four different fraudulent schemes perpetrated

by Defendants Omnicare, Inc., its parent company CVS Health Corporation, and CVS Rx Services, Inc. (collectively, "Omnicare" or "the Omnicare Defendants").

2.      Omnicare is an institutional pharmacy that fills prescription drug orders for residents of assisted living communities, personal care homes, and other long-term care facilities.

3.      The first two fraudulent schemes involve Omnicare submitting claims containing incorrect NDC numbers to federal health care programs in violation of the False Claims Act.

4.      It is a violation of federal, state, and professional regulations and standards to dispense a drug that does not match the NDC on the prescription label and bill as if it did.

5.      In addition to defrauding Medicare and Medicaid, this practice of dispensing a drug with a different NDC than what was prescribed, what was billed to its payors, and what was stored in its patients' records is unsafe given the potential of future drug recalls, possible drug interactions and allergies, and differing potencies between the drug that is dispensed and the drug that is billed.

6.      As further described below, despite entering into two different False Claims Act settlements that covered similar conduct between January 2006 – September 2014 and January 2008 – December 2014 respectively, Omnicare failed

to implement controls to ensure that all of the prescription drugs it dispensed matched the NDCs it billed Medicare and Medicaid until being required to do so by its Corporate Integrity Agreement entered into with the Department of Health and Human Services Office of Inspector General in late 2016.   Even then, as Relator alleges below, the fraudulent conduct continued in two different ways.

7.     First, as Relator alleges below, from when he started in 2012 and continuing today, albeit on a smaller scale, Omnicare pharmacists have improperly and routinely executed manual overrides during the pharmacist verification 2 or "PV2" process and dispensed drugs that did not match what was billed to federal health care payors.

8.     Even after the implementation of enhanced compliance measures, multiple internal audits and override reports show continued improper and invalid overrides. For example, from October 25, 2016 – November 5, 2016, Omnicare identified over 92,000 improper PV2 overrides.  To Relator's knowledge and belief, Omnicare has not refunded these improper claims.

9.     Second, Omnicare perpetrated a similar fraudulent scheme for its compounded drug products, particularly those made off-site, and despite strengthening its internal controls at the PV2 step for other prescription drugs,

Omnicare did not fully cure these issues until July 2020 for some locations as further described below.

10.     Even more, while alleging addressing improper PV2 overrides involving compounded drug products at some locations, from June 2018 – early 2020, certain Omnicare locations, such as the Spartanburg hub where Relator worked, falsified supporting documentation related to these compounded drugs and continued the fraud until it was ultimately addressed.

11.     Third, Omnicare knowingly billed for new prescriptions that were verified by unlicensed, out-of-state pharmacists in violation of state law.

12.     Fourth, Omnicare knowingly billed for controlled substances dispensed as part of emergency kits and did not obtain a written prescription as required by law within 7 days.

13.     As a direct and foreseeable result of Omnicare's fraudulent schemes, Omnicare has submitted hundreds of thousands of false claims to the Medicare and Medicaid Programs.

## II.     Jurisdiction and Venue

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 (United States as plaintiff) and 28 U.S.C. § 1331 (federal question jurisdiction).

15.     This Court has personal jurisdiction over the Defendants, and venue is proper in the Northern District of Georgia pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391, in that one or more Defendants can be found, resides, or transacts business in this District, and the violations of the False Claims Act described below were carried out in this District.

### III.    Parties

16.     Relator Matt Badr is a licensed pharmacist (Pharmacy License No. 13141) and a resident of South Carolina.  A 2010 graduate of the University of Georgia's College of Pharmacy, Relator started his pharmacy career as a floater pharmacist at CVS Pharmacy.  From October 2012 – late February 2021, Relator worked for CVS Omnicare as a Dispensing Pharmacist at the Spartanburg hub where he personally witnessed the fraud alleged herein.  In this role, Relator executed daily pharmacist operations including verification, drug utilization review, and dispensing of prescription drugs.  He also managed the workflow and supervised the pharmacy technicians and interns.

17.     Defendant Omnicare, Inc. is one of the nation's largest pharmacies and a leading national provider of pharmaceutical medications for the elderly, servicing skilled nursing facilities (SNFs), assisted living facilities (ALFs), and other long-term and elder care providers.  Prior to its acquisition by CVS Health

Corporation, Defendant Omnicare, Inc. was a Delaware corporation with corporate offices located at 201 E 4th Street, Cincinnati, OH 45202. Its registered agent was The Corporation Trust Company located at 1209 Orange Street, Wilmington, DE 19801. Defendant Omnicare, Inc. provides services to residents in 47 states, the District of Columbia, and Canada.

18.     Effective August 18, 2015, Defendant CVS Health Corporation purchased Defendant Omnicare, Inc., which is now its wholly owned subsidiary. Defendant CVS Health Corporation is a Delaware corporation, and its registered agent, The Corporation Trust Company, is also located at 1209 Orange Street, Wilmington, DE 19801.

19.     Defendant CVS Rx Services, Inc. is a New York corporation and a subsidiary of Defendant CVS Health Corporation. Relator Badr was paid by Defendant CVS Rx Services, Inc. Its registered agent is CT Corporation System, 28 Liberty Street, New York, NY 10005.

## IV.     False Claims Act

20.     The False Claims Act imposes civil liability on any person who –

A.      knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

B.      knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

…

G.  knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(A), (B), (G).

21.    A person or an organization that violates the False Claims Act is liable to the United States Government for a civil penalty for each violation, plus three times the amount of damages the Government sustains because of the violation. *See* 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9) (Civil Monetary Penalties Inflation Adjustment).[1]

22.    The False Claims Act, 31 U.S.C. § 3729(b) further provides the following definitions:

(1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to

---

[1] For civil penalties assessed after January 29, 2018, whose associated violations occurred after November 2, 2015, the civil monetary penalties range from a minimum of $11,181 to a maximum of $22,363 for each violation of the False Claims Act.  *See* 28 C.F.R. § 85.5.  For violations occurring on or before November 2, 2015, the civil penalty ranges from $5,500 to $11,000 for each violation. *See* 28 C.F.R. § 85.3(a)(9).

defraud;

(2) the term "claim" (A) means any request or demand, whether under contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . .

(3) the term "obligation" means an established duty, whether or not fixed, arising from an expressed or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729 (2009).

## V.   Medicare Prescription Drug Coverage

23.    Most of the prescriptions that Omnicare fills are paid for in whole or in part by the Medicare Program.

24.    Congress created the Medicare Program in 1965 with the passage of Title XVIII of the Social Security Act, *see* 42 U.S.C. § 426, § 426-1.

25.     Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a component of the United States Department of Health and Human Services.

26.     Medicare provides hospital insurance, prescription drug benefits, and other healthcare benefits for people 65 years and older, people with end stage renal disease, and certain people who are disabled. *See id*.

27.     Medicare beneficiaries may obtain prescription drug benefits in three ways.

28.     First, Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care.  42 U.S.C. §1395c-1395i-2 (1992). Medicare Part A also covers skilled nursing services.  Medicare Part A pays participating Skilled Nursing Facilities (SNFs) a per diem that covers all patient-related expenses, including prescription drugs.  Under Medicare Part A, CMS makes these reimbursement payments based on the actual cost data a facility submits to CMS in the facility's annual Medicare Cost Reports.  In that Cost Report, the facility reports the price it paid for drugs purchased from Omnicare.

29.     Second, beneficiaries who participate in traditional Medicare insurance for medical services (under Medicare Parts A and B) may also enroll in a

stand-alone drug plan that covers prescription drugs called Medicare Part D.  *See*

42 C.F.R. § 423.30.  This is known as a Prescription Drug Plan or "PDP."

30.     Third, Medicare Part C creates a managed care option for

beneficiaries.  *See* 42 U.S.C. § 1395w-21 to § 1395w-29.

31.     Beneficiaries who participate in a Medicare Advantage plan (that is, a

managed care plan under Medicare Part C) for their medical benefits may elect to

add prescription drug coverage to the basic health plan that covers their medical

benefits.  This is known as a Medicare Advantage Prescription Drug Plan or "MA-

PD." *See* 42 C.F.R. § 422.4(c) & § 423.4.

32.     CMS contracts with commercial insurance carriers, known as

Medicare Advantage Organizations, to offer Medicare Advantage Plans under

Medicare Part C.  The Plans cover medical services, such as hospital and physician

services that are eligible for traditional Medicare coverage, as well as supplemental

benefits.  *See* 42 C.F.R. § 422.100(c).

33.     Examples of Medicare Advantage Organizations that offer drug

benefits as part of Medicare Advantage Plans in Georgia include but are not

limited to: Humana, Blue Cross and Blue Shield of Georgia, Cigna-Healthspring,

WellCare, and Aetna Medicare.

34.     Both types of prescription drug plans – PDP and MA-PD – must comply with the requirements of Medicare Part D, as described next.  *See* 42 C.F.R. § 423.104.

A.     <u>**Medicare Part D – Prescription Drug Benefit Plan Requirements**</u>

35.     Part D of the Medicare Program became effective January 1, 2006. Part D was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, to provide prescription drug benefits for Medicare beneficiaries.

36.     Medicare Part D is a voluntary insurance program that is subsidized by federal funds in the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund.  *See* 42 U.S.C. § 1395w-101; 42 C.F.R. §423.315(a).

37.     Private insurance companies known as Part D Sponsors contract with CMS to offer prescription drug benefit plans to Medicare beneficiaries.  In Georgia, Aetna Medicare, Humana Insurance Company, Express Scripts Medicare, SilverScript, WellCare, UnitedHealthcare and others are Sponsors offering Part D prescription drug benefit plans.

38.     CMS pays monthly payments and subsidies from the Medicare Prescription Drug Account to Part D Sponsors to fund the prescription drug benefit plans they sell.  42 C.F.R. §423.315(a).

39.     Part D Sponsors are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

40.     Part D Sponsors frequently contract with Pharmacy Benefit Managers (PBMs) to administer their drug benefit plans.  The PBMs typically process claims for payment submitted by pharmacies and beneficiaries, form pharmacy networks, perform audits, and conduct other plan management activities under contracts with Part D Sponsors.

41.     Part D Sponsors (and PBMs on behalf of Part D Sponsors) enter into reimbursement agreements with pharmacies (such as Omnicare) that provide covered drugs and supplies to the Medicare beneficiaries enrolled in the prescription drug benefit plans they sponsor.

42.     Generally, when a pharmacy dispenses drugs or supplies to a Medicare beneficiary, the pharmacy collects a portion of the cost from the beneficiary and submits a claim electronically to the beneficiary's Part D Sponsor, its PBM, or to the Medicare Advantage Prescription Drug Plan, all of which are authorized Medicare contractors.

43.     For covered drugs and supplies, the pharmacy receives reimbursement from the Medicare contractor for the portion of the drug cost not paid for by the beneficiary.  The reimbursement amount is negotiated and set forth in the reimbursement agreement between the pharmacy and the Medicare contractor.

44.     As to each such pharmacy claim, the Part D Sponsor (or other contractor) submits to CMS an electronic statement called a Prescription Drug Event.

45.     CMS relies upon the Prescription Drug Event data and other factors in an annual reconciliation process to determine the payment amounts made to the Part D Sponsor, and CMS recoups or pays additional funds to the Sponsor as a result of the Prescription Drug Event data.

46.     Claims for payment submitted by a pharmacy to the patient's Medicare prescription drug plan thus are "claims" within the meaning of the False Claims Act.  They are requests for money made to a Government contractor, the money is to be spent or used to advance a Government program (that is, the Medicare program), and federal funds are used to make the payment to the pharmacy and to reimburse the Government contractor.

47.     CMS regulations clearly state, "Payments to a Part D sponsor are conditioned upon provision of information to CMS that is necessary to carry out this subpart, or as required by law."  42 C.F.R. § 423.322.

48.     Pursuant to that regulation, on April 26, 2006, CMS issued a document entitled "Instructions: Requirements For Submitting Prescription Drug Event Data." CMS explains in the Introduction:

49.     As a condition of payment, all Part D plans must submit data and information necessary for CMS to carry out payment provisions [citing 42 C.F.R. § 423.322]. This document describes how CMS will implement the statutory payment mechanisms by collecting a limited subset of data elements on 100 percent of prescription drug "claims" or events…

50.     Every time a beneficiary fills a prescription covered under Part D, plans must submit a summary record called the prescription drug event (PDE) record to CMS. The PDE record contains prescription drug cost and payment data that will enable CMS to make payment to plans and otherwise administer the Part D benefit…

51.     The submitted data components fit together to allow calculation of payment under the four legislated payment mechanisms.

52.     By filing the PDE record with CMS, the recipients of Medicare Part D payments are certifying that "the claims data" submitted is "accurate, complete, and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(3).

**B.     Medicare Claims Submission Process**

53.     Pharmacies, such as Omnicare, submit claims for payment for prescription drugs in electronic format to Medicare Plans (including Medicare Part D and Medicare Advantage Prescription Drug Plans).

54.     Medicare Plans require pharmacies to submit claims in compliance with a universal claim format established by the National Council for Prescription Drug Programs, Inc. (NCPDP), a not-for-profit industry organization recognized by CMS.

55.     The NCPDP established a pharmacy claim format known as the NCPDP Telecommunication Standard.  Each Medicare Plan publishes a form known as a Payer Sheet that tracks the NCPDP Telecommunication Standard and provides specific claim instructions to pharmacies.

56.     The Payer Sheet includes identifying numbers for each Medicare Plan. Plans are identified with a BIN (Bank Identification Number) and a PCN (Processor Control Number).  When a pharmacy receives the patient's plan

information, the pharmacy consults the Payer Sheet for that Plan and follows the instructions for submitting claims for payment to the Plan.

57.   Medicare Plans are identified with unique BIN and PCN numbers, putting the pharmacy on notice when a claim for payment is submitted to Medicare as opposed to a commercial insurance plan.  *See* 42 C.F.R. §423.120(c)(4).

58.   A pharmacy claim for payment must contain the BIN and PCN number for the Medicare Plan, as well as the following information, among other things:

- date of service
- patient demographic information including insurance number and type of residence (*e.g.*, assisted living community)
- prescription number, drug and **National Drug Code (NDC),** dosage, refills, and date of prescription **(emphasis added)**
- pharmacy type (*e.g.*, institutional pharmacy)
- pricing information such as ingredient cost, dispensing fee, sales tax, and gross amount due
- prescriber's name and NPI.

## C.   Certifications of Compliance

59.   Omnicare, as a Medicare-participating pharmacy, makes certain express and implied certifications of compliance with laws and regulations that are material to the government in making payment decisions on Medicare claims.

60.    In order to receive Part D funds from CMS, Part D sponsors and their contracted pharmacies are required to comply with all applicable federal laws, regulations, and CMS instructions.

61.    By statute, all contracts between a Part D sponsor and HHS must include a provision whereby the Part D sponsor agrees to comply with the applicable requirements of the Part D program as well as the terms and conditions of payment governing the Part D program.  42 U.S.C. § 1395w-112.

62.    Part D sponsors must also certify in their contracts with HHS that they will agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the False Claims Act.  42 C.F.R. § 423.505(h)(1).

63.    CMS regulations further require all contracts between Part D Sponsors and pharmacies (such as Omnicare) to contain language obligating the pharmacies to comply with all applicable federal laws including the applicable regulations and CMS instructions. *See* 42 C.F.R. § 423.505(i)(4)(iv).

64.    Compliance with these requirements thus is a material and essential condition of payment for prescription drug medications dispensed by pharmacies to Medicare beneficiaries.

65.     Omnicare, as a contractor with numerous Part D plan sponsors, must "certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement."  42 C.F.R. § 423.505(k)(3).

66.     Each claim Omnicare submits to Medicare Advantage Organizations and Part D plan sponsors conveys, among other things, information about the patient, the prescriber, the drug dispensed (identified by NDC code), the pharmacy, and the date the prescription was filled.  By failing to submit accurate information regarding the prescription dispensed, these specific representations on the claim are false and misleading.

67.     Omnicare also violated the express representations it made in its contracts with the Part D sponsors to abide by all applicable federal laws, applicable regulations, and CMS instructions by virtue of the conduct alleged below.

68.     Omnicare knowingly used the false representations in its contracts with the Part D plan sponsors to submit and obtain reimbursement for prescription drugs from Medicare.  The Part D plan sponsors relied on the false representations made by Omnicare when it submitted Prescription Drug Event data to Medicare.

In turn, Medicare relied on the accuracy of this data when it reimbursed the Part D plan sponsors. If Medicare had known about Omnicare's false claims and false representations, it would not have reimbursed the Part D plan sponsors, which in turn, would not have paid Omnicare's claims.

## VI.    Medicare Requirements for Pharmacy Claims for Prescription Drugs

69.    The National Drug Code (NDC) System serves as a universal product identifier of human drugs. Its purpose is to provide the Commissioner of the Food and Drug Administration (FDA) a current list of all drugs manufactured, prepared, propagated, compounded, or processed by a drug establishment registered under the Food, Drug, and Cosmetic Act.

70.    Every drug has its own unique NDC. The NDC number consists of 11 digits in a 5-4-2 format. The first 5 digits identify the labeler code representing the manufacturer of the drug and are assigned by the FDA. The next 4 digits identify the specific drug product and are assigned by the manufacturer. The last 2 digits define the product package size and are also assigned by the manufacturer. Some packages will display fewer than 11 digits, but leading "0s" can be assumed and need to be used when billing.

71.    Federal health care programs require the inclusion of an NDC code on every claim for reimbursement for a prescription drug. 21 C.F.R. § 201.25(b)(l) &

(c)(l) specifically require that every prescription drug product "must have a bar code that contains, at a minimum, the appropriate National Drug Code (NDC) number in a linear bar code that meets European Article Number/Uniform Code Council (EAN/UCC) or Health Industry Business Communications Council (HIBCC) standards or another standard or format that has been approved by the relevant Food and Drug Administration Center Director."

72.    The use of NDC numbers when submitting prescription drug claims is necessary to facilitate the accurate payment and management of drug costs based on what was actually administered and billed.

73.    CMS requires as a condition of payment that the NDC of the prescription drug dispensed be reported in the PDE.

74.    Submitting a PDE record certifying to a false NDC that is not the NDC of the prescription drug dispensed is a violation of this condition of payment.

75.    Inclusion of accurate NDC on the prescription drug pharmacy claim is material to CMS's decision to pay for the claim.

### VII.    Medicare Requirements for Compounded Drugs

76.    A compounded drug is a specially formulated medication prepared by a licensed pharmacist and personalized for an individual patient, or whom

commercially manufactured medications are unavailable or unsuitable, pursuant to a written prescription written by a patient's treating physician.

77.    Under Section 503A of the Food, Drug, and Cosmetic Act, a compounded drug is exempt from certain FDCA requirements, including new drug approval, certain labeling, and current good manufacturing requirements, provided the compounded drug meets established criteria.  These criteria require the drug to be compounded by a pharmacist by a pharmacist or physician based on a valid prescription.  *See* 21 U.S.C. § 353a(a), as amended by Pub. L. No. 113-54, §106, 127 Stat. 587,598 (Nov. 2013).

78.    Compounded drugs are not FDA-approved, and therefore, do not meet the definition of a "Part D covered drug."  However, CMS permits Part D Plan Sponsors to cover a compounded drug if the compounded drug:

- Contains at least one active ingredient that meets the definition of a Part D drug – meaning that it would be covered by Part D if it were dispensed separately; and

- Does not contain any ingredients that would be covered under Medicare Part B.

Medicare Prescription Drug Manual, Ch. 6, § 10.4.  *See also* 42 C.F.R. § 423.120(d).

79.     CMS requires Part D Plan Sponsors to pay for all ingredients that independently meet the definition of a Part D drug.  The Medicare Prescription Drug Manual, Ch. 6, § 10.4 states: "Bulk powders (i.e. Active Pharmaceutical Ingredients for compounding) do not satisfy the definition of a Part D drug and are not covered by Part D."

80.     In addition, under Medicare Part D, federal payments are not available for inactive ingredients used to make a compounded drug.  In general, under Medicare Part D, federal payments are unavailable for drugs not approved by the FDA, drugs not available by prescription for purchase in the United States, and drugs for which payment would be available under Parts A or B of Medicare. See 42 U.S.C. § 1395w-102(e).

81.     Compounded drugs do not have NDC codes for the entire compound.

82.     Instead, providers must submit the claim using the HCPCS code for "not otherwise classified" drugs then must keep a record of the NDC for each ingredient drug either in the service line on the claim form or in supporting documentation such as invoices.

83.     Medicare or the Part D sponsors reimburse these claims based on the NDCs for the ingredients used as reflected in what the pharmacy billed.

84.     Accurately identifying the NDCs used in the compounded drug is therefore material to CMS or the Part D sponsor's decision to reimburse the claim and the reimbursement amount for the claim.

### VIII.     Medicaid

85.     The Medicaid Program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or children.

86.     The Medicaid Program is a jointly funded federal-state health care program and is administered by CMS at the federal level.  Within broad federal rules, each state determines eligibility requirements for Medicaid, the services covered, payment levels for services, and administrative and operational procedures.

87.     Individual states pay providers directly and then obtain their federal share of the payment, which varies by state, from accounts funded by the United States Treasury.  *See* 42 C.F.R. §§ 430.0, 430.30 (1994).

88.     In order to qualify for federal funds, the state Medicaid programs are required to implement a State Plan containing certain specific minimum criteria for

coverage and payment of claims, as set forth by the federal Medicaid statute. *See* 42 U.S.C. § 1396a.

89.    Certain state Medicaid programs reimburse for prescription drugs or compounded drugs based on the NDC.  In these states, accurate NDC reporting therefore directly impacts the Medicaid program's reimbursement amount.

90.    Congress also requires pharmacies to use NDC codes as the basis for Medicaid billing so as to effectuate the Medicaid Drug Rebate Program. Referring to the payment for outpatient drugs through the Medicaid Drug Rebate Program, Congress mandated that "the information shall be submitted under subparagraphs (A) [for single source drugs] and (B)(ii) [for multiple source drugs] using National Drug Code codes unless the Secretary specifies that an alternative coding system should be used." 42 U.S.C. § 1396r-8(a)(7)(C). The Secretary of Health and Human Services has not specified any alternative to the NDC system.

91.    CMS uses the NDCs from the claims to calculate how much a manufacturer is required to issue as a rebate under the program. Accurate reporting, and thus accurate rebates, means the NDCs submitted to Medicaid must accurately reflect the drug, manufacturer, and package size; otherwise the numbers could be skewed, and manufacturers may end up paying too much or too little. Moreover, drugs that are not subject to rebates are not reimbursable by Medicaid,

and so reporting the wrong NDC could result in Medicaid reimbursing for a non-covered drug. Accordingly, Medicaid programs will deny claims with improper NDCs.

92.     For example, the West Virginia Medicaid has stated: "Claims without the proper NDC qualifier, an NDC, and units of measurement associated with the NDC will deny. Claims with a date of service prior to January 1, 2008 will display a warning message on the remittance voucher."  NDC and HCPCS Frequently Asked Questions, available

at https://dhhr.wv.gov/bms/HCPCS/Documents/FAQsNDC_HCPCS_012712_v.%208.pdf

93.     Arizona Medicaid similarly requires: "The NDC is found on the drug container, i.e. vial, bottle, tube. The NDC submitted to the AHCCCS FFS Program and/or MCO Contractors must be the actual NDC number on the package or container from which the medication was administered. Claims may not be submitted for one manufacturer when a different manufacturer's product was administered. It is considered a fraudulent billing practice to bill using an NDC other than the one assigned to the drug administered."  Notice of Changes to Billing Requirements for Drugs Administered in Outpatient Clinical Settings, revised September 10, 2012, available

25

at https://www.azahcccs.gov/PlansProviders/Downloads/FINALSTAKEHOLDER

JCODEMEMO.pdf

94.    Louisiana Medicaid has nearly identical language.  National Drug

Code (NDC) Requirements for Physician Administered Medication, NDC AND

HCPCS FREQUENTLY ASKED QUESTIONS, available

at https://www.lamedicaid.com/provweb1/NDC_QA.pdf.

## IX.    Defendants' Pharmacy Operations

### A.   Hub Pharmacies

95.    Relator Badr worked at Omnicare's Spartanburg facility, which is one

of several "Omnicare hubs," which means it handles a higher volume of

prescriptions than other pharmacies and performs all refills for an entire

geographic region.

96.    The Spartanburg hub handles prescriptions and refills for the South

Carolina and North Carolina region.

97.    Hub pharmacies also typically handle all refill prescriptions for

Omnicare's patients.

98.    As further described below, Omnicare's hub pharmacies frequently

outsource the preparation of its compounded drugs that contained narcotics and its

inhaled drug products to local compounding pharmacies.

26

99.     Other hubs include Omnicare's locations in: Peabody, Massachusetts; Edison, New Jersey; King of Prussia, Pennsylvania; Perrysburg, Ohio; Richmond, Virginia; Bradenton, Florida; Salt Lake City, Utah; Portland, Oregon; La Vista, Nebraska; Indianapolis, Indiana; Cincinnati, Ohio; Florence, Kentucky; Florissant, Missouri; Nashville, Tennessee; Fort Work, Texas; Canoga Park, California; and Sacramento, California.

**B.    Spoke Pharmacies**

100.    Omnicare also operates localized "spoke" pharmacies, which primarily dispense new prescriptions and certain refills that are received from the hubs.

101.    Omnicare spoke pharmacies often similarly outsource the compounding of certain drugs.

**C.    Standard Prescription Fill Practice**

**(i)    "Manual" or "Floor" Prescription Fills**

102.    Omnicare receives physician prescription orders from a SNF or ALF through its imaging system, Perceptive Content.

103.    An Omnicare technician monitors the incoming orders at the hub and routes them to the proper area.

104.   Another technician then enters the order into the pharmacy's user interface, which at the Spartanburg hub is called Reflections (and previously was called OmniDX) and at the Georgia hub is called Oasis, under the correct patient profile.

105.   A pharmacist, such as Relator, then performs a verification, known as "Pharmacist Verification 1" or "PV1." This verification includes reviewing the computer image of the order and checking for accuracy against the technician's entry into the computer system.

106.   Once the pharmacist verifies the order in PV1, the pharmacist types "Y" into a box indicating the completion of that step, and the claim is submitted electronically for payment.

107.   Once the claim is accepted (nearly instantaneously with most proper claims), the prescription is deemed "label ready." At this time, a technician on the floor prints the patient label, which is a sticker that is later affixed to the product for dispensing.

108.   At the hub pharmacies, the technician goes into the warehouse, finds the drug, and brings it to the pharmacist.

109.   The NDC for a drug is unique to the  specific drug manufacturer, the dosage strength, and the package size.

110.   Some frequently-ordered medications are prepacked, meaning they are already assembled in the correct dosage and amount and include a product label on it with the correct NDC.  Other prescriptions require hand-packing, meaning the technician has to pull the bottle of pills and count them out.

111.   The prescription is taken to a second pharmacist, who performs the second and final verification known as the "Pharmacist Verification 2" or "PV 2." PV2 entails scanning the patient label barcode, which shows what was ordered and submitted to the payor for reimbursement) and scanning the product barcode.  If the two barcodes match, PV2 is complete.  If there is a discrepancy, then the pharmacist should either reject the prescription and require the technician to correctly fill the prescription with the matching NDC or reverse the claim and resubmit it with the correct NDCs of what Omnicare actually plans to dispense. Allowing a mismatch means that the Defendants have submitted a false claim using the wrong NDC.

112.   Once PV2 is complete and the prescription drugs are approved, Omnicare ships the prescriptions to the SNF, ALF, or a local spoke pharmacy, which in turn, distributes them to the SNFs or ALFs.

**(ii)**     **Auto Label Verification ("ALV") Prescription Fills**

113.  Certain Omnicare pharmacies use an Auto Label Verification (ALV) robotic device to automate the dispensing process.  Not all Omnicare pharmacies utilize an ALV device.  The Spartanburg hub is the only Omnicare pharmacy in South Carolina with an ALV.

114.  Whether a prescription will go through the ALV process or be handled manually depends on what is being prescribed.  For example, the Spartanburg facility had a list of approximately 100-200 drugs to be handled via ALV.  In Relator's experience, these were the most commonly ordered prescriptions, and the ALV process was used simply to increase efficiency.

115.  If the product is to be dispensed by the ALV system, it performs the work of the technician who is responsible for obtaining the prescription from the warehouse.  The ALV utilizes pre-packaged bingo cards that have either been purchased or put together by Omnicare staff.  The pharmacy tech retrieves whichever cards the machine indicates it needs from the machine's dedicated inventory area and feeds the cards into the machine.

116.  After a PV1 is performed, the ALV prints out and applies a prescription label to the container. It then dispenses the drug and places it into a plastic tote that moves via rollers into the pharmacist verification area.

117.  However, the ALV is generally loaded with just one bioequivalent drug; no matter which NDC was on the label, it would dispense that bioequivalent.

118.  From 2008 to 2016, Omnicare's ALV system did not use the NDC at the PV2 stage to verify that the NDC of the product being dispensed matched the NDC of the patient label and prescription.

119.  Instead of using OmniDX's PV2 dashboard, the pharmacist uses the ALV robot's software to scan the patient label barcode and the product barcode. Whereas the OmniDX system would alert the pharmacist of a non-NDC match for product and patient label (which as noted above was "overridden" anyway prior to the 2016 change in policy), the ALV system does not. The ALV verification did not compare NDCs but rather only verified the drug and strength. Thus, no override was required because mismatches were not even flagged.

120.  As explained below, Omnicare has already settled this conduct from 2008 – 2014, and pharmacy claims fulfilled using the ALV are outside the scope of Relator's complaint.

## X.  Omnicare's Repeated Fraudulent Conduct

### A.  *Ervin* Settlement

121.  In October 2016, Omnicare entered into a False Claims Act settlement agreement with the United States and several states.  The allegations had been

brought to the government's attention through a complaint and amended complaint (adding several states as parties) filed in *United States et al. ex rel Ervin v. Omnicare, Inc.*, No. 2:13-cv-00146-MCE-KJN (E.D. Cal.).

122.   According to the Covered Conduct of the settlement agreement, Omnicare had improperly manually overridden changes to the NDC field on pharmacy claims re-submitted to Medicare, Medicaid, and TRICARE after those payors had initially rejected those claims, for claims entered during the period from January 2006 – September 2014, which resulted in the submission of false claims. Unlike Relator's allegations below regarding to improper conduct at the PV2 step, the manual override at issue in this case and settlement occurred on Omnicare's "Online Send" screen.

123.   In 2016, as part of the settlement agreement and other settlement agreements related to Anti-Kickback Statute allegations, Omnicare entered into a Corporate Integrity Agreement, which imposed certain compliance requirements on Omnicare and its employees particularly related to ensuring Omnicare's claims contain accurate NDCs.

124.   In the First Amended Complaint and Second Amended Complaint, Relator Ervin had also alleged that Omnicare dispensed controlled substances

pursuant to emergency verbal orders and failed to obtain written confirmation of the emergency verbal orders within 7 days as required by law.

125.   On May 13, 2020, the United States Drug Enforcement Administration ("DEA") announced a $15.3 million settlement with Omnicare, Inc. for: (1) failing to control emergency kits by improperly permitting long-term care facilities to remove opioids and other controlled substances from emergency kits days before doctors provided a valid prescription; and (2) repeatedly failing to document and report oral emergency prescriptions of Schedule II controlled substances.

126.   However, according to the DEA release, the settlement only resolved allegations in connection with the following districts:  Central District of California, Eastern District of California, Colorado, Oregon, and Utah.

**B.**     ***Corsie & Ezzie Settlement***

127.   Shortly after the *Ervin* settlement, Omnicare resolved yet another False Claims Act case.  This time, Omnicare paid $8 million to resolve allegations that they had billed government health care programs for different drugs than what Omnicare actually dispensed to its patients for drugs filled using the ALV system.

128.   The allegations had been brought to the government's attention through a complaint filed in *United States ex rel. Elizabeth Corsi and Christopher Ezzie v. Omnicare, Inc.,* No. 1:14-cv-01136-JEI-JS (D.N.J.).

129.   According to the Covered Conduct from the time period January 2008 – December 2014, Omnicare designed and implemented its ALV system to utilize a less specific drug code known as MEDID during the PV2 verification process instead of the more specific NDC corresponding to the drug intended to be dispensed and billed.  This, in turn, caused (1) Omnicare's ALV to approve the dispensing of certain generic drugs in more than two million transactions where the drug actually dispense was made by a different manufacturer and had a different NDC than the drug initially identified by the pharmacist to be dispensed; (2) Omnicare to knowingly submit claims for payment to Medicare and Medicaid for drugs with different NDCs than those actually dispensed; and (3) the dispensing of drugs to patients with patient-specific labels displaying the incorrect manufacturer and/or NDC.

130.   The United States further alleged that the false manufacturer and NDC information on the labels impacted Omnicare's ability to properly track and, if necessary, conduct a patient-level recall of such mismatched drugs.

131.   Notably, this Covered Conduct and therefore, the False Claims Act settlement are limited to NDC mismatches caused by the ALV.

132.   Further, as Relator observed, Omnicare failed to correct this fraudulent conduct involving the ALV device until 2016 as part of the implementation of the enhanced compliance measures adopted as a result of the Corporate Integrity Agreement entered into to resolve the *Ervin* complaint, despite the fact that the Covered Conduct in the *Corsi and Ezzie* case only covered Omnicare's conduct until December 2014.

133.   Moreover, this "fix" required little more than changing the settings on the ALV system to verify NDC codes at PV2, and so could have easily been put into place years earlier.

134.   ALVs are programmed with numerous options, so that a pharmacy can meet the different requirements of different states and payors. Relator does not have firsthand knowledge as to why Omnicare did not simply apply the correct settings to its ALV. However, the *Corsi* complaint makes a convincing argument that Omnicare knowingly chose not to set the ALV to conduct an NDC match because it is inefficient. This explanation is certainly consistent with Relator's scheme alleged below regarding its instructions to pharmacists to override NDC mismatches in the name of efficiency.

## XI.   Omnicare's Fraudulent Schemes

**A**.   **Billing for Different NDCs than what was Actually Dispensed**

**(i)   PV 2 Verification/Override Fraud**

135.   When Omnicare utilizes technicians to manually fill prescriptions ("floor" prescriptions), the technicians are responsible for going into the warehouse, finding the drug, and bringing it to the pharmacist.

136.   Prior to November 2016, when Omnicare pharmacists encountered NDCs that did not match during the PV2 process, Omnicare pharmacists were instructed to execute a manual override in the system, dispense the non-conforming drug, and not to reverse the false claim that had been submitted at the outset.

137.   Omnicare pharmacists were not required to have the technician procure the correct drug, and Omnicare would not reverse or correct the previously submitted claim.

138.   Omnicare pharmacists executed thousands of these overrides at facilities nationwide every month.

139.   In addition to defrauding Medicare and Medicaid, this creates three patient safety concerns.

140.   First, because the NDC on the prescription label and in the patient's records does not match what is actually dispensed, the patient will not be alerted to any drug recalls.

141.   Second, a patient may have an allergic reaction to the excipients in the drug, such as dyes or fillers.

142.   Third, the potency of generic drugs is compared to the initial brand name drug, not to one another, and need only fall within a bioequivalent range of 80% to 125% to be considered a "pharmaceutical equivalent."  Thus, a switch from a brand drug to a generic drug could result in a patient going from 100% to 80% potential.  But, a switch from a generic drug to another generic drug could result in a patient going from 80% potency (of the original brand name drug) to 125% potency, more than a 50% increase.

143.   As already explained, in October 2016, the United States and several States announced a nationwide $2.24 million settlement of a *qui tam* filed in the Eastern District of California.  *United States et al. ex rel. Darlene Ervin v. Omnicare, Inc.*, Civil Action No. 2:13-cv-0146-MCE-KJN (E.D. Cal.)(March 11, 2015).  In this settlement agreement, the government settled allegations that between January 1, 2006 and September 1, 2014, Omnicare employees "manually altered the National Drug Code (NDC) field on claims resubmitted to Medicare,

Medicaid, and TRICARE, in order to overcome prior rejection of these claims for payment." Press Release, U.S. Dept. of Justice, Government Reaches $2.24 Million Settlement with Institutional Pharmacy Omnicare in Lawsuit First Brought by Former Regional Service Area Director in Lodi (Oct. 19, 2016), *available at* https://www.justice.gov/usao-edca/pr/government-reaches-224-million-settlement-institutional-pharmacy-omnicare-lawsuit-first.

144.   The manual overrides alleged in the *Ervin* case occurred at the "online send" page, not at the PV2 step as alleged by Relator Badr.

145.   As a result of this settlement and other False Claims Act settlements related to anti-kickback allegations, Omnicare also entered into a Corporate Integrity Agreement (CIA) in October 2016. The CIA required the creation of the following systems and procedures to address this conduct:

E. Accurate Prescription Drug Labeling and Dispensing Systems and Procedures

Within 150 days after the Effective Date, CVS Health shall create systems and procedures reasonably designed to ensure the accurate labeling, tracking, dispensing, and billing of the drug name and manufacturer to the Federal health care programs of prescription drugs dispensed or used in connection with the IPS Operations. These systems and the procedures shall include, but are not limited to, the following:

1. tracking patient prescription drug information, including information about what specific drug, manufacturer, strength, and dosage was provided to each individual patient, for the purpose of

identifying patients impacted by recalls, market withdrawals, and safety alerts; and

     2. establishing and implementing a schedule of routine audits of the Automated Label Verification system and any other automated prescription labeling and dispensing system used in IPS Operations to ensure accurate prescription drug labeling, tracking, dispensing, and billing to the Federal health care programs.

Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and CVS Health Corporation (Oct. 11, 2016).

146.   Despite this settlement, the CIA, and these newly required compliance program enhancements, Omnicare pharmacists continued the improper overrides alleged by Relator Badr, and Omnicare failed to reverse and resubmit the underlying claims.

147.   For example, Bill Deane, Vice President of Pharmacy Operations, circulated a spreadsheet documenting 92,674 overrides by Omnicare pharmacists from October 2016 to November 5, 2016, at Omnicare facilities throughout the country and in every region.

148.   In a November 4, 2016 email, Brian Warner, Senior Manager for Operations, noted that the previous day, locations using Oasis performed an override on "over 2,000 orders."

149.   Mr. Deane responded by advising that Omnicare would employ a zero tolerance policy for this new initiative which he said "pertains to our newly signed CIA."

150.   Omnicare formalized the new rule—that the product being dispensed must match the NDC of the product entered, billed, and verified—as Policy 033 – Medication Dispensing and Policy 088 – Final Verification Process.

151.   Yet, Omnicare's fraudulent practices continued, albeit on a smaller scale.

152.   For example, in November 2017, an internal audit revealed that four separate facilities—Tennessee, Southern New Jersey, Southern Michigan, and Northwest Ohio—had invalid overrides.

153.   In June 2018, an internal audit revealed that on June 19, 2018, fifteen separate facilities, including Relator's location, had a total of 58 invalid overrides: Spartanburg, San Antonio, Atlanta, Cincinnati, Northern Illinois, Appleton, Milwaukee, Maine, Ballston Spa, Morgantown, Northwest Ohio, Wadsworth, Annapolis Junction, Salisbury, and Lynchburg.

154.   Another report showed from May 16, 2018 to June 4, 2018, Omnicare performed 1,626 overrides on invalid scans.

155.   Even more concerning to Relator, while Omnicare instructed its employees to reverse improperly overridden claims and resubmit the claims as they were actually dispensed to the patients, Relator uncovered that this frequently did not occur.

156.   In April 2020, Relator received a report of all overrides at Omnicare locations across the country from October 25, 2016 – November 5, 2016.  Relator received this report because October 31, 2016 was the date Omnicare supposedly converted from NDC09 to NDC11, and they were going to start auditing overrides.

157.   When Relator received this report he reviewed a sample of the 92,674 claims that had previously been identified as improperly overridden from October 21, 2016 – November 5, 2016.  Relator discovered that despite Omnicare's clear policies to the contrary, Omnicare had not actually reversed and rebilled these claims.

158.   Many of these claims constitute overpayments from federal health care programs that Omnicare improperly retained.

159.   Further, all Medicare and Medicaid claims containing non-matching NDCs that were improperly overridden constitute false claims to these federal health care programs.

**(ii)**      **Compounding Drug Fraud**

160.   Despite its multiple False Claims Act settlements, Corporate Integrity Agreement, and all of the warnings Omnicare received related to the importance of ensuring the NDCs of the drugs it dispensed matched the NDCs of the drugs it billed federal health care programs, Omnicare waited even longer to address the exact same issues with the compounded drugs it dispensed and billed to federal health care programs.

161.   Drug compounding is the process of combining, mixing, or altering ingredients to create a medication to the specific needs of an individual patient.

162.   Compounded drugs are not FDA-approved and do not have their own NDC numbers.

163.   Instead, the pharmacy must submit on its claim to a federal health care program the NDCs for each of the ingredients in the compounded drug.  These NDCs are specific not only to the drug used but also to the dosage form – e.g., whether it is a bulk powder or a tablet.

164.   Federal health care programs, such as Medicare, frequently do not reimburse for bulk powders.

165.   Like many of its locations, Defendants at the Spartanburg hub outsource the preparation of all compounded drugs that include controlled substances, such as Ativan, or that are prepared for inhalation.

166.   Generally, to make compounded drugs, a pharmacy needs special equipment. For example, bulk powders are incredibly dangerous compared to working with crushed tablets or opening capsules.  Pharmacists, therefore, need to use a powder hood when working with these bulk powders to prevent inhaling any drug powder from the air.

167.   By way of further example, inhaled or ophthalmic compounds have to be prepared in a sterile environment and use a sterilization method, such as an autoclave.  These compounded drugs are also frequently more complex and may involve pH buffering, preservatives, or correct tonicity.  For these reasons, other Omnicare hubs likely outsource the preparation of these compounded drugs.

168.   The Spartanburg hub contracts with Shertech Pharmacy, an independently owned specialty compounding pharmacy located at 1360 Drayton Road in Spartanburg, SC 29307.

169.   After Omnicare receives the prescription order for the compounded drug, Omnicare submits a claim for the compounded drug to the payor, which

oftentimes is a federal health care program, using the ingredients called for in the prescription.

170.    The compounded drug is deemed "label ready," and the Omnicare Defendants would then send the prescription and an order to the local compounding pharmacy, which in the case of the Spartanburg hub would be Shertech Pharmacy, to prepare the compounded drug.

171.    The local compounding pharmacy, such as Shertech Pharmacy, would then prepare the compounded drug, and ship it to Omnicare.

172.    At many locations such as the Spartanburg hub, Omnicare never received any information from the local compounding pharmacy listing the actual NDCs used in the compound until July 2020.

173.    Instead, upon receipt, rather than following its normal PV2 practice of scanning a label indicating the components of the compounded drug, Omnicare pharmacists were instructed to scan a generic "compound NDC" bar code or perform an override.  This would log the compounded drug prescription in the OmniDx system as a "valid scan."  Thus, the pharmacists never checked to confirm that the drugs actually used in preparation of the compounded drug were the same as what was billed to the federal health care program.

174.   Relator learned that oftentimes what Omnicare had billed payors, including federal health care programs, for the compounded drug did not match what Shertech Pharmacy, or other local pharmacies, actually used in preparation of the compounded drug.

175.   For example, Omnicare would bill using the NDC for the tablet form of the drug while the outside compounding pharmacy such as Shertech Pharmacy actually prepared it using a bulk powder.

176.   This could directly impact whether the ingredient was covered at all by the federal health care program, and even if so, the amount of the reimbursement.

177.   In other instances and with some restrictions as to the applicable state law, the compounding pharmacy may have used different drugs that they had in stock rather than what was called for in the prescription.  While the compounded pharmacy cannot legally interchange drugs without prescriber authorization, they may use whatever manufacturer's drug they have on hand so long as the pharmacy bills for the accurate NDC.

178.   This not only resulted in Omnicare submitting false claims to federal health care programs, it also led to potential safety issues as Omnicare, in its role as the dispensing pharmacy, did not maintain a record of the ingredients actually

used in the compounded drugs it dispensed.  In the case of a recall, Omnicare would not have been able to alert its patients that their compounded drug was affected.

179.   Despite Omnicare's 2016 Corporate Integrity Agreement, Omnicare did not immediately correct its fraudulent compounded drug billing practices.

180.   Instead, two years later in June 2018, Omnicare management circulated a memorandum to General Managers, Pharmacists in Charge, and IV Departments announcing that "functionality has been added to the system to require ingredient level scanning at PV2."  Omnicare acknowledged, "This is an important element of our Corporate Integrity Agreement."

181.   The memorandum stated, "It is important that each ingredient used to make a non-IV compound and IV compound match the NDC 11 of what is billed."

182.   The memorandum announced the implementation of this change for Omnicare pharmacies located in the following locations: Spartanburg, SC; Charleston, SC; Charlotte, NC; Florence, SC; Hickory, NC; Raleigh, NC; Oklahoma City, OK; Tulsa, OK; Minnesota; Northern California; Hayward, CA; Redding, CA; Reno, NV; Sacramento, CA; Santa Rosa, CA; Richmond, VA; Harrisonburg, VA; Portsmouth, VA; Roanoke, VA; Abingdon, VA; Lynchburg,

VA; Central Massachusetts; Northern Massachusetts; Ballston Spa, NY; New Hartford, NY; Rochester, NY; and Syracuse, NY.

183.   The memorandum provides written confirmation that prior to this June 2018 change and at least at the locations listed, Omnicare lacked internal controls to ensure that its locations included accurate NDCs on the claims they submitted to federal health care programs for compounded drugs.

184.   Under the new June 2018 policy, Omnicare management instructed the pharmacists to scan the pharmacy label, which lists the ingredients in Omnicare's formula for that prescription, and then manually retype those ingredients into the system as verification that they "match." This registered in the OmniDX system as a "scan."

185.   Yet this June 2018 change did not cure all of Omnicare's improper compounded drug billing practices.

186.   While this may have worked for compounded drugs made in-house at the Omnicare pharmacy, it did not work for compounded drugs prepared at off-site pharmacies, such as Shertech, since at least at the Spartanburg hub, Omnicare still did not receive a list of the ingredients used by the off-site pharmacies to prepare the compounded drug.

187.   At the Spartanburg hub and likely at other locations that were similarly missing the ingredient list from the compounding pharmacy, beginning about June 14, 2018, PV2 pharmacists could no longer scan the generic compound barcode.  Instead, management instructed pharmacists to look up the ingredient NDCs from Omnicare's system's recipes for each compounded drug and then type them again into the PV2 verification field.  Once these "matched", the PV2 step was complete.  However, since Omnicare did not know what ingredients were actually used for compounded drugs that had been made at outsourced facilities, this exercise was meaningless.

188.   In these instances, Omnicare continued to falsely bill federal health care programs for the compound ingredients listed in its stored compound recipes rather than what was actually used by the off-site compounding pharmacy to create the compounded drug.

189.   It was not until two years later in July 2020, when the Spartanburg hub finally implemented a process requiring Shertech to provide the accurate ingredient information to Omnicare.  The Omnicare pharmacist was then able to reverse and resubmit the claim to payors, including federal health care programs, for the correct NDCs actually included in the compounded drug.

190.   Relator was told by a colleague that someone at Omnicare had run a report comparing the NDCs Shertech had billed Omnicare to what Omnicare had billed its payors, including federal health care programs, which revealed significant discrepancies between the NDCs in these two sets of claims.

191.   By way of representative example, Omnicare maintained in the OmniDX system at the Spartanburg hub a compound ingredients page for the compounded drug Ativan/Haldol .5/ 2 Gel 60 mL.

192.   The only ingredients listed are Haloperidol 2 mg tablet 100EA and Lorazepam .5mg tablet 500EA.  The page fails to identify the cream or base used to prepare the compounded drug.

193.   Further, the NDC code listed for this compounded drug is 00378021401, which is a unique NDC for Haloperidol tablets.

194.   Compounding pharmacies, such as Shertech, routinely prepare compounds such as this Ativan/Haldol cream using bulk powders rather than crushing expensive tablets.

195.   Any claim submitted by Omnicare using the ingredients in OmniDX when Shertech used the bulk powder form of Haloperidol would constitute false claims.

196.   For example, on February 4, 2020, Omnicare filled Rx number R22786528 for this Ativan/Haldol .5/2 gel for a patient at the Golden Age of Inman senior living facility in Inman, South Carolina.  The claim submitted by Omnicare for this prescription was likely false.

197.   By way of further representative example, Omnicare maintained in its OmniDx system at the Spartanburg hub a compound ingredients page for the compounded drug Decadron/Ativan/Benadryl 10/1/12.5 MG cream.

198.   The NDC code listed for this compound is 00054418425, which is a unique NDC for Dexamethasone tablets.

199.   The only ingredients listed are Dexamethasone 4MG tablet, Lorazepam 1MG tablet, and Banophen Minitab 25MG tablet.  The recipe page fails to identify the cream or base used to prepare the compounded drug.

200.   Compounding pharmacies, such as Shertech, routinely prepare compounded drugs such as this Decadron/Ativan/Benadryl cream using bulk powders rather than crushing the expensive tablets.

201.   Any claim submitted by Omnicare using the ingredients in OmniDX when Shertech used the bulk powder form of Dexamethasone would constitute false claims.

202.   On June 13, 2018, one day after the new PV2 process was finally implemented for compounded drugs, Omnicare PV2 pharmacist Evan Snow verified a claim submitted for this compounded drug and performed an override. He would have had no way of doing this with accurate information since he did not have a list of the ingredients used by Shertech in preparing the compounded drug.

203.   By way of further example, even when Omnicare listed the correct ingredients actually used in the compound drug in its compound ingredient file (both in terms of the bulk powder form and the brand/generic version), Omnicare sometimes listed falsified amounts of the drugs.

204.   For example, OmniDX contains an Inventory Master Information for ABH .5/12.5/.5 SPA 60 mL.  Omnicare's formula for this compounded drug actually calls for 1 gram of each ingredient, thus creating a 16.67/16.67/16.67 compound.  Omnicare's formula—were it used—would result in 33 times the intended dose of Ativan, likely causing severe respiratory depression.  If Omnicare submitted a claim with the NDCs on its formula, and the compounding pharmacy used the correct ratios instead, the claim would be false and Omnicare would receive an overpayment.

205.   When Relator discovered that Omnicare had been using this improper formula to submit claims for ABH .5/12.5/.5 SPA 60 mL, he fixed the compound

ingredient list in the OmniDx system.  This correction reduced the price Omnicare would charge federal health care programs by $80.

## B. Billing for New Prescriptions Verified by Unlicensed, Out-of-State Pharmacists

206.   Omnicare's third fraudulent scheme involves improperly billing for new prescriptions that had been verified by unlicensed, out-of-state pharmacists.

207.   Pursuant to 21 NCAC 46 .1417(h), governing Remote Medication Order Processing Services, "All pharmacists located in this State or employed by an out-of-state remote medication order processing pharmacy providing services in this State shall be licensed by the Board."

208.   However, from approximately late 2017 until late 2018, Omnicare pharmacists who were not licensed in North Carolina routinely engaged in remote medication order processing services, *i.e.*, verifying the prescriptions that are filled at in-state "spoke" pharmacies. Upon information and belief, this occurred at other "hub" locations throughout the United States, as Omnicare switched from a state-by-state to a regional model of verifying prescriptions for assisted living facilities.

209.   Pharmacist licensure depends on the location of the pharmacy filling the prescription. Thus, if a pharmacist in South Carolina is filling and verifying a prescription in a South Carolina pharmacy, they are governed by South Carolina

regulations and must be licensed in South Carolina, even if the prescription is being sent to a facility in North Carolina. The pharmacy itself must be licensed to send the prescription to North Carolina.

210.   Until about late 2017, new prescriptions were generally filled and verified at the local spoke pharmacies, and refill prescriptions were generally filled and verified at the hub pharmacies. This meant that the pharmacists at the Spartanburg hub generally needed to only be licensed in South Carolina.

211.   In late 2017, Omnicare created and hired all new staff for a "Senior Living Division" (SLD) at its hub locations who verified new prescriptions for patients at assisted living facilities. This meant that, for example, from their offices at the Spartanburg hub location, the pharmacists would log directly into the systems of the spoke pharmacies in both South Carolina *and* North Carolina to verify new prescriptions. Thus, although they were sitting in South Carolina, because they were performing the verification function on behalf of the spoke North Carolina pharmacy, pursuant to state regulations they were required to be licensed by the board of North Carolina.

212.   When Omnicare established the SLD at the Spartanburg hub, however, few if any of its pharmacists were licensed in North Carolina.

213.   Omnicare employs this same hub-and-spoke model throughout the United States, and so upon information and belief, other locations similarly engaged in unlicensed practice.

214.   Very quickly after this change, the SLD became overwhelmed, so Omnicare began requesting that the regular SNF pharmacists, including Relator, verify prescriptions until it could catch up. At the time, most of the SNF pharmacists also were not licensed in North Carolina.

215.   Prior to the creation of the SLD, Relator recalls having been encouraged to get licensed in North Carolina so that he could verify prescriptions, but it was never entirely clear why.

216.   When the SLD was formed, however, Omnicare management told them that licensure in North Carolina was not necessary. Relator had already been preparing for the North Carolina exam, and so he obtained his license on May 9, 2018, but by that point he had been verifying prescriptions in North Carolina for a period of at least 6 months.

217.   Presumably, around this same time, Omnicare changed its licensing policy, as the other SLD pharmacists became licensed in North Carolina as well. Some were licensed within six months of Relator getting his license, but others took nearly a year.

218.   In-state licensure of the pharmacists responsible for verifying the prescription drug order is material to payment by federal health care programs.

219.   Therefore, any prescription drug claims verified by unlicensed out-of-state pharmacists would constitute false claims.

## C.     Billing for Emergency Prescriptions for Controlled Substances Without Later Obtaining Written Verification

220.   Pursuant to 21 C.F.R. § 1306.11(d)(4)(emphasis added), a pharmacy, such as Omnicare, may dispense an emergency oral prescription for a Schedule II Controlled Substance, so long as it obtains a **written prescription within seven days**:

> In the case of an emergency situation, as defined by the Secretary in §290.10 of this title, a pharmacist may dispense a controlled substance listed in Schedule II upon receiving oral authorization of a prescribing individual practitioner, provided that… Within 7 days after authorizing an emergency oral prescription, the prescribing individual practitioner shall cause a written prescription for the emergency quantity prescribed to be delivered to the dispensing pharmacist. In addition to conforming to the requirements of §1306.05, the prescription shall have written on its face "Authorization for Emergency Dispensing," and the date of the oral order. The paper prescription may be delivered to the pharmacist in person or by mail, but if delivered by mail it must be postmarked within the 7-day period. Upon receipt, the dispensing pharmacist must attach this paper prescription to the oral emergency prescription that had earlier been reduced to writing. For electronic prescriptions, the pharmacist must annotate the record of the electronic prescription with the original authorization and date of the oral order. The pharmacist must notify the nearest office of the Administration if the prescribing individual practitioner fails to deliver a written prescription to him; failure of the

pharmacist to do so shall void the authority conferred by this paragraph to dispense without a written prescription of a prescribing individual practitioner.

221.   However, "[c]entral fill pharmacies shall not be authorized under this paragraph to prepare prescriptions for a controlled substance listed in Schedule II upon receiving an oral authorization from a retail pharmacist or an individual practitioner." 21 C.F.R. § 1306.11(d)(5).

222.   Pursuant to 21 C.F.R. § 1300.01, "*Central fill pharmacy* means a pharmacy which is permitted by the state in which it is located to prepare controlled substances orders for dispensing pursuant to a valid prescription transmitted to it by a registered retail pharmacy and to return the labeled and filled prescriptions to the retail pharmacy for delivery to the ultimate user. Such central fill pharmacy shall be deemed 'authorized' to fill prescriptions on behalf of a retail pharmacy only if the retail pharmacy and central fill pharmacy have a contractual relationship providing for such activities or share a common owner."

223.   As described above, in May 2020, the United States Drug Enforcement Administration ("DEA") announced a $15.3 million settlement with Omnicare, Inc. for: (1) failing to control emergency kits by improperly permitting long-term care facilities to remove opioids and other controlled substances from emergency kits days before doctors provided a valid prescription; and (2)

repeatedly failing to document and report oral emergency prescriptions of Schedule II controlled substances.

224.   However, according to the DEA release, the settlement only resolved allegations in connection with the following districts:  Central District of California, Eastern District of California, Colorado, Oregon, and Utah.  *See* Disclosure Exhibit 30, Relator-Omnicare-000417-000418.

225.   Based upon Relator's information and belief, Omnicare's practice of not obtaining a written verification of an emergency prescription has occurred throughout the United States.

226.   Relator obtained a report run showing many instances across the country in April and May 2020 alone for which Omnicare had not obtained a written prescription to validate an emergency prescription for Controlled II Substances it had dispensed.

227.   For example, Omnicare of Northwest Ohio dispensed Rx Order No. 113766622, a FENTANYL 50 MCG/HR PATCH, to a patient at Facility 509 pursuant to an oral order on April 23, 2020.  As of May 6, 2020, 13 days had passed since the oral order, and Omnicare had not obtained a written order for this prescription.

228.   By way of further example, Omnicare of Northern Illinois dispensed Rx Order No. 931401901, HYDROCODONE-ACET 5-325 TAB, to a patient at Facility 417 pursuant to an oral order on April 21, 2020.  As of May 6, 2020, 15 days had passed since the oral order, and Omnicare had not obtained a written order for this prescription.

229.   By way of further example, Omnicare of Tampa dispensed Rx Order No. 732671025, MORPHINE SULF ER 100 MG TABLET, to a patient at Facility 192 pursuant to an oral order on April 22, 2020.  As of May 6, 2020, 14 days had passed since the oral order, and Omnicare had not obtained a written order for this prescription.

230.   Failure to obtain a written prescription, which is a material condition of payment pursuant to 21 C.F.R. § 1306.11(d)(4), would render these emergency prescriptions submitted to federal health care programs false claims.

231.   Further, once Omnicare became aware of these past-due prescription orders, Omnicare had a duty to return these overpayments to the federal health care programs.

## XII.   Omnicare Knew Its Fraudulent Schemes Were Unlawful

232.   Defendants know and have known since the inception of their fraudulent schemes that compliance with the applicable requirements is a material

condition of participating in the Medicare and Medicaid Programs as a pharmacy and a prerequisite to receiving reimbursement from the Medicare and Medicaid Programs through its contractors. *See* 42 U.S.C. § 1320a-7b(b).

233.   Omnicare's executive team is comprised of many experienced healthcare executives with long careers in the pharmacy and long-term care industries who are well aware of the Medicare and Medicaid programs' requirements.

234.   Further, Omnicare has entered into multiple False Claims Act settlement agreements for similar conduct as it relates to billing for claims using NDCs that do not match what was actually dispensed.

235.   In 2016, Omnicare paid $2.24 million to resolve allegations related to improper altering of NDCs on its claims submitted to Medicare, Medicaid, and TRICARE between January 1, 2006 and September 1, 2014.  *United States et al. ex rel. Darlene Ervin v. Omnicare, Inc.*, Civil Action No. 2:13-cv-0146-MCE-KJN (E.D. Cal.)(filed March 11, 2015).

236.   In March 2017, Omnicare again entered into a settlement agreement, paying $8 million to resolve allegations that from January 2008 through December 2014, Omnicare designed and implemented its ALV system to utilize less specific drug codes than the specific NDCs corresponding to the drug intended to be

dispensed and billed.  *United States  et al. ex rel. Elizabeth Corsi and Christopher Ezzie v. Omnicare, Inc.*, No. 1:14-cv-001136-JEI-JS (D. N.J.).

237.   Omnicare's 2016 Corporate Integrity Agreement also put Omnicare on notice of its fraudulent conduct when it specifically required CVS Health/Omnicare to develop systems and procedures to ensure the accurate labeling, tracking, dispensing, and billing of the drug name and manufacturer to the Federal health care programs of the prescription drugs dispensed.

238.   The Corporate Integrity Agreement also required CVS Health and Omnicare to routinely audit its ALV system.

239.   Defendants have also been put on notice as to the materiality of these requirements through its Provider Agreement, certifications it has been required to submit, and the training it has been required to provide.

240.   Most of Defendants' profits come from reimbursement (*i.e.*, payments for prescription drugs and supplies) by the Medicare Program through Medicare Part D Sponsors, PBMs, and Medicare Advantage Prescription Drug Plans.

241.   To participate in the prescription drug coverage plans of the Medicare patients, Omnicare enters into a reimbursement contract, sometimes known as a Provider Agreement, with each Medicare Part D Sponsor or other Medicare contractor that administers the drug plans for those patients.

242.   The Provider Agreements that Omnicare enters into with Medicare contractors expressly require Omnicare to comply with all applicable federal laws, and applicable regulations and CMS instructions. *See* 42 C.F.R. §423.505(i)(4)(iv).

243.   Pursuant to such Provider Agreements, Omnicare also is required to train its employees on these requirements.

244.   Part D Sponsors and other contractors also publish compliance policies instructing pharmacies about the importance of complying with federal healthcare laws.

245.   Omnicare, having entered into numerous Provider Agreements with Medicare contractors, is well aware that compliance with the applicable statutes and regulations is a material condition of payment by the Medicare program, including payments by Part D Sponsors MA-PD Plans pursuant to contracts with Medicare.

246.   Omnicare also enters into Provider Agreements with the state Medicaid programs which contain similar certifications related to compliance with the Medicaid requirements ensuring that Omnicare is well aware of the materiality of listing the proper NDCs on its claim forms.

**Count One**
**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**(False Claims)**

247.   Relator repeats and realleges the allegations in paragraphs 1-246 in the Complaint as if fully set forth herein.

248.   As set forth above, Omnicare submitted claims for payment for prescription drugs and compounded drugs using NDCs that did not match the prescription drugs and compounded drugs Omnicare actually dispenses.

249.   As set forth above, in some instances, Omnicare has continued to submit claims for payment for prescriptions drugs using NDCs that do not match the prescription drugs and compounded drugs Omnicare actually dispenses

250.   Accurately identifying the NDCs of the prescription drugs and compounded drugs dispensed is a material condition of receiving reimbursement from the Medicare and Medicaid Programs.

251.   Omnicare also used unlicensed out-of-state pharmacists to verify prescriptions in violation of state law.

252.   Compliance with the state law licensure requirements is a material condition of receiving reimbursement from the Medicare and Medicaid Programs.

253.   Omnicare also dispensed emergency controlled substances without obtaining a written prescription within 7 days.

254.   Compliance with this regulation is a material condition of receiving reimbursement from the Medicare and Medicaid Programs.

255.   Omnicare's claims for payment for the prescriptions impacted by these four fraudulent schemes were false claims and were not eligible for payment by Medicare or Medicaid.

256.   As a foreseeable result of Omnicare's conduct, Omnicare knowingly submitted or caused the submission of hundreds of thousands of false claims to Medicare and Medicaid for payment, in violation of the False Claims Act, 31 U.S.C. § 3729(a).

257.   By virtue of the false claims the Defendants presented or caused to be presented, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

## Count Two
## Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
## (False Records and Statements Material to False Claims)

258.   Relator repeats and realleges the allegations in paragraphs 1-246 the Complaint as if fully set forth herein.

259.   In connection with the false claims that Omnicare submitted or caused to be submitted to Medicare and Medicaid, Omnicare knowingly made or used, or

caused others (such Medicare Part D Sponsors, PBMs, MA-PD Plans, and ESI) to make or use, false records or statements that were material to false or fraudulent claims for payment submitted to Medicare and Medicaid.

260.   By reason of these false records or statements, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

### Count Three
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
### (Failure to Return Overpayments)

261.   Relator repeats and realleges the allegations in paragraphs 1-246 of the Complaint as if fully set forth herein.

262.   By knowingly engaging in the fraudulent schemes set forth above, Defendants knew they were ineligible to participate in the Medicare and Medicaid programs or to receive Medicare or Medicaid reimbursement for prescription drug and compounded drug claims.

263.   Defendants had a duty under federal law to return excess payments, known as overpayments, to Medicare and Medicaid within 60 days of when the overpayments were identified.  *See* 42 U.S.C. § 1320a-7k(d)(2).

264.   Medicare or Medicaid payments that Defendants received after they knowingly perpetrated the fraudulent schemes set forth above were overpayments that Defendants had an affirmative legal obligation to report and return to the Medicare or Medicaid programs.  Defendants are not entitled to keep federal taxpayer money they were not eligible to receive.

265.  An overpayment knowingly retained after 60 days becomes an "obligation" within the meaning of the reverse false claims provision of the False Claims Act.  42 U.S.C. § 1320a-7k(d)(3).

266.   A defendant that "knowingly conceals or knowingly and improperly avoids or decreases an obligation" to return funds to federal programs is liable under the False Claims Act.  31 U.S.C. § 3729(a)(1)(G).

267.   Defendants made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

268.   Defendants improperly retained such overpayments with actual knowledge of the legal obligation to return the funds to Medicare or Medicaid, or with reckless disregard or deliberate ignorance of the legal obligation to return the funds to Medicare or Medicaid because they were not entitled to keep the funds.

269.   By reason of Defendants' knowing and improper retention of the overpayments described herein, the United States has suffered damages in an amount to be determined at trial and is entitled to recover treble damages plus a civil penalty for each false claim.

WHEREFORE, Relator Mathur Badr respectfully prays for the entry of judgment against Defendants awarding the following relief:

For the United States of America

(a) Three times the amount of damages the United States sustains because of each violation of the False Claims Act; and

(b) A maximum civil penalty for each false claim or false statement;

For the Relator

(c) An award of 30% of the judgment amount, settlement, or other remedy arising from this action; and

(d) An assessment against Defendants under the False Claims Act of litigation costs and reasonable attorneys' fees as provided by 31 U.S.C. §3730(d);

(e) Pre- and post-judgment interest on the awards ordered herein; and

(f) such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Relator respectfully demands a trial by jury on all issues so triable.


Respectfully submitted this 13th day of April, 2021.

*/s/ Michael J. Moore*
MICHAEL J. MOORE
Georgia Bar No. 520109
CHARLES W. BYRD
Georgia Bar No. 100850
AIMEE J. HALL
Georgia Bar No. 318048
ELIZABETH S. WHITE
Georgia Bar No. 258844
CAROLINE G. MCGLAMRY
Georgia Bar No. 230832

**POPE, MCGLAMRY, KILPATRICK,**
**MORRISON & NORWOOD, P.C.**
3391 Peachtree Road, NE, Suite 300
Atlanta, GA 30326
(404) 523-7706
efile@pmkm.com


***Attorneys for Relator Mathur Badr***

## **CERTIFICATION**

Pursuant to N.D. Ga. L.R. 7.1(D), counsel for Plaintiff hereby certifies that this document has been prepared with Times New Roman (14 point) font, which font has been approved under L.R. 5.1(C).